The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number**: _____

**Filing Date:** August 14, 2023

**NO. S-1-SC-38861**

**STATE OF NEW MEXICO,**

　　　Plaintiff-Respondent,

v.

**HUGO VASQUEZ-SALAS,**

　　　Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
Fred T. Van Soelen, District Judge

Bennett J, Baur, Chief Public Defender
M.J. Edge, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Hector H. Balderas, Attorney General
Walter M. Hart, III, Assistant Attorney General
Santa Fe, NM

for Respondent

**OPINION**

**VARGAS, Justice.**

{1} In this case, we address the authority of police officers under the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution to inquire into matters unrelated to an otherwise lawful traffic stop by asking for a passenger's identifying information such as name and date of birth. Because the officer's inquiry here was permissible under both the Fourth Amendment and Article II, Section 10, we affirm the district court's denial of Defendant's motion to suppress, albeit for different reasons than those articulated by the Court of Appeals.

**I.     BACKGROUND**

{2} In the predawn hours of August 18, 2015, Officer Brice Stacy of the Clovis Police Department stopped and detained the vehicle Hugo Vasquez-Salas (Defendant) was riding in because it had a broken rear license-plate light, a misdemeanor under the Motor Vehicle Code. *See* NMSA 1978, § 66-3-805(C) (1978, amended 2018); NMSA 1978, § 66-8-116(A) (2014, amended 2023) (listing the penalty assessment misdemeanors). As Officer Stacy approached the vehicle, he saw a partially open backpack in the back seat with bolt cutters, protective eyeglasses, two pairs of gloves, and a face mask later clarified at trial as a

"camouflage face mask that goes over the entire head, just leaving an opening for the face," sticking out of the backpack. Officer Stacy testified that he saw the tools when he first approached the car because they were easy to see through the back window. Although the tools alone did not initially raise his suspicion, Officer Stacy testified that he became suspicious that the tools may have been burglary tools "when [he] started talking to [the driver and Defendant]," because the "driver was real nervous, he was showing me all kinds of signs that he was nervous, not wanting to give me any kind of identifiers, [and] he seemed to be confused about his age."

{3}     After he determined that the driver of the vehicle was an unlicensed minor, Officer Stacy asked Defendant if he had a driver's license in an attempt to determine whether Defendant could drive the vehicle. Defendant said he did not have a driver's license. Officer Stacy then asked Defendant his age, to which Defendant responded that he was twenty-two.

{4}     Turning back to the driver, Officer Stacy asked him for his first name, last name, and date of birth. The driver provided Officer Stacy with an incorrect last name and date of birth. It is unclear at what point Officer Stacy discovered the driver's real name. What is clear is that the driver's stated date of birth conflicted with the driver's prior statement that he was sixteen because the driver's stated date

of birth would have made him seventeen years old at the time of the stop. When Officer Stacy returned his attention to Defendant, the following exchange took place:

**Officer Stacy (to Defendant)**: What's your first name?

**Defendant**: Sergio.

**[…]**

**Officer Stacy**: What's your last name?

**Defendant**: Vasquez.

**[…]**

**Officer Stacy**: What's your date of birth?

**[…]**

**Defendant**: I'm thirty.

**[…]**

**Officer Stacy**: You're thirty? Okay. What's your date of birth?

**Defendant**: '84.

**Officer Stacy**: '84? Okay. What's your full date of birth?

**Defendant**: 1984.

**Officer Stacy**: 1984—okay, let's start from the beginning. Give me the month, the day, and then the year. What's the month?

**Defendant**: October 8, 1984.

**Officer Stacy**: And you said you're how old?

3

**Defendant**: Thirty.

**Officer Stacy**: And less than five minutes ago, you were twenty-two?

**Defendant**: Yeah, I know, I was just bullshitting you.

**Officer Stacy**: Okay, hang tight.

Defendant's real name is Hugo Vasquez-Salas and he was twenty-eight at the time of the stop. After speaking with Defendant, Officer Stacy returned to his patrol car and requested backup.

{5} Officer Wormley, the officer who responded to Officer Stacy's request for backup, read Defendant his *Miranda* rights and questioned him. Defendant was charged with possession of burglary tools, contrary to NMSA 1978, Section 30-16-5 (1963). In the district court, Defendant asserted that Officer Stacy's expansion of the traffic stop by asking Defendant for his identifiers constituted an unlawful seizure. Defendant claimed that, as a result of the unlawful seizure, he was entitled to suppression of (1) "[a]ny and all evidence seized from Defendant after the unlawful seizure," (2) "[a]ny and all statements made by Defendant after the unlawful seizure," and (3) "[a]ll other fruits of the illegal questioning of Defendant."

{6} Based on the evidence presented and Officer Stacy's testimony, the district court determined that Officer Stacy had "reasonable articulable suspicion to expand his investigation into a burglary tools investigation" and denied the motion to

4

suppress. In announcing its ruling, the district court judge explained that Officer Stacy's suspicions had already been raised about the burglary tools before he asked Defendant for his identifiers. The district court concluded that the totality of the circumstances supported Officer Stacy's expansion of the investigation. These included the combination of the tools, the lack of evidence that the tools were used as part of a job or occupation, the driver's and Defendant's unusual behavior, the driver's status as an unlicensed minor, and the time of day.

{7} At trial, the State presented witness testimony, audio and video evidence including lapel video, and the items found in the backpack. Defendant was convicted of possession of burglary tools. Defendant appealed to the Court of Appeals, claiming, in relevant part, that the district court erred when it denied his motion to suppress. Defendant relied upon *State v. Affsprung*, 2004-NMCA-038, ¶¶ 4, 20-21, 135 N.M. 306, 87 P.3d 1088, and *State v. Estrada*, 1991-NMCA-026, ¶¶ 10-11, 111 N.M. 798, 810 P.2d 817, to support his claim that the district court erred in denying his motion. *See State v. Vasquez-Salas*, A-1-CA-37856, mem. op. ¶¶ 2, 7 (N.M. Ct. App. May 17, 2021) (nonprecedential). The Court of Appeals affirmed the district court, rejecting all of Defendant's claims. *Id.* ¶¶ 1, 18-19. The Court of Appeals reasoned that *Affsprung* was factually distinguishable because the officer in that case had "no suspicion whatsoever of criminal activity." *Id.* ¶¶ 4-5 (internal quotation

5

marks and citation omitted). It explained that *Estrada* was distinguishable because the only individualized fact known to the officer in that case was a misplaced tire, whereas in this case, there were many factors, including Officer Stacy's observation of multiple tools that he believed were burglary tools. *Id.* ¶ 7. Upon consideration of Defendant's petition, we granted certiorari.

## II. DISCUSSION

{8} The question before this Court is whether Officer Stacy had reasonable suspicion of criminal activity to expand the investigation beyond the initial traffic stop to ask Defendant for his identifiers.[1] We first outline the appropriate standard of review and proceed to examine whether Defendant's rights were violated under the Fourth Amendment of the United States Constitution or Article II, Section 10 of the New Mexico Constitution. Concluding that Defendant's rights were not violated, we affirm.

### A. Standard of Review

{9} Defendant claims that the district court improperly denied his motion to suppress. Denial of a motion to suppress presents a "mixed question of fact and law." *State v. Leyva*, 2011-NMSC-009, ¶ 30, 149 N.M. 435, 250 P.3d 861. Our review of

---

[1]Defendant does not question, and we do not address, the validity of the initial traffic stop or the sufficiency of the evidence to justify the stop.

6

the district court's denial involves a two-step process. *Id.* First, we examine whether substantial evidence supported the district court's findings, "with deference to the district court's review of the testimony and other evidence presented." *Id.* When the district court does not issue formal findings of fact in denying a motion to suppress, as in this case, we "draw from the record to derive findings based on reasonable facts and inferences." *State v. Yazzie*, 2019-NMSC-008, ¶ 4, 437 P.3d 182 (internal quotation marks and citation omitted). "[W]e then review de novo the [district] court's application of law to the facts to determine whether the search or seizure were reasonable." *Leyva*, 2011-NMSC-009, ¶ 30. We have previously established that when, as in this case, "there are no findings of fact and conclusions of law, an appellate court will draw all inferences and indulge all presumptions in favor of the district court's ruling." *State v. Funderburg*, 2008-NMSC-026, ¶ 10, 144 N.M. 37, 183 P.3d 922 (internal quotation marks and citation omitted). Our review is not limited to the record made at the motion to suppress hearing. Instead, we "may review the entire record to determine whether there was sufficient evidence to support the [district] court's denial of the motion to suppress." *State v. Johnson*, 1996-NMCA-117, ¶ 21, 122 N.M. 713, 930 P.2d 1165; *see State v. Martinez*, 1980-NMSC-066, ¶ 16, 94 N.M. 436, 612 P.2d 228; *accord State v. Monafo*, 2016-NMCA-092, ¶ 10, 384 P.3d 134.

**B.     Reasonable Suspicion**

{10}     A traffic stop to investigate a potential violation constitutes a seizure of the occupants of the vehicle under the Fourth Amendment, thereby requiring reasonable suspicion. *Leyva*, 2011-NMSC-009, ¶ 10 (seizure); *State v. Martinez*, 2018-NMSC-007, ¶ 10, 410 P.3d 186 (reasonable suspicion). "In analyzing whether an officer has reasonable suspicion, the trial court must look at the totality of the circumstances, and in doing so it may consider the officer's experience and specialized training to make inferences and deductions from the cumulative information available to the officer." *Id*. (internal quotation marks and citation omitted). Reasonable suspicion exists when the officer becomes "aware of specific articulable facts that, judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted). "Suspicion of criminal activity need not necessarily be of a specific crime." *Leyva*, 2011-NMSC-009, ¶ 23. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal quotation marks and citations omitted).

**C.      The Fourth Amendment of the United States Constitution**

**1.      Defendant's Fourth Amendment rights were not violated**

{11}      "The Fourth Amendment guarantees the right of the people to be free from unreasonable searches and seizures." *Leyva*, 2011-NMSC-009, ¶ 8; U.S. Const. amend. IV. "Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Leyva*, 2011-NMSC-009, ¶ 9 (internal quotation marks and citation omitted).

{12}      The appropriate inquiry under the Fourth Amendment when the legality of the initial stop is uncontested, as is the case here, is "whether an officer's traffic stop questions extended the time that a driver was detained, regardless of the questions' content." *Id.* ¶¶ 17, 31 (internal quotation marks and citation omitted). Questions asked by law enforcement "during a traffic stop [do not] need to be reasonably related to the initial justification of the stop in order to be permissible." *Id.* ¶ 18. Nonetheless, the temporal limitation provided by this bright-line test requires that "an investigating officer return a driver's documents and permit the driver to depart as soon as the reason for the traffic stop has been completed (unless, of course, the officer has developed reasonable suspicion to conduct an investigation into other criminal activity)." *Id.* ¶ 20. When the officer asks questions "during the time it

[takes] to reasonably complete the initial traffic investigation," the questions are constitutionally permissible. *Id.* ¶ 28. A de minimis detention after the completion of the stop is not unreasonable and therefore does not violate the Fourth Amendment. *Id.* ¶ 33.

{13} In *Leyva*, the officer had already completed his investigation when he asked the defendant whether there were any "knives, needles, guns, or drugs" that the officer needed to know about before turning the car over to a third party because the defendant's suspended license rendered him unable to drive the vehicle. *Id.* ¶¶ 33-34 (internal quotation marks omitted). The *Leyva* Court held that the question was permissible under the Fourth Amendment because it was a de minimis extension of the stop. *Id.* ¶ 35. The Court reasoned that

> [i]t would be nonsensical if we were to hold [that the officer] violated [the defendant]'s Fourth Amendment rights by asking the question *immediately after* handing him the citation, when the questions undoubtedly would have been permitted if [the officer] had asked *while he was writing the citation or running the records check.*

*Id.* ¶ 33 (second emphasis added).

{14} Reviewing the facts of this case under the totality of the circumstances, *Martinez*, 2018-NMSC-007, ¶ 12, we conclude that Defendant's rights were not violated under the Fourth Amendment because Officer Stacy's questions concerning Defendant's identifiers did not measurably extend the length of the stop. In this case,

10

the officer was compelled to ask Defendant additional questions to complete the stop because the driver did not have a driver's license and could not drive the car away. This included questioning Defendant to determine whether he could drive the car. Officer Stacy's attempt to complete the original stop in a diligent manner made the duration of the stop more reasonable. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (noting that, "in determining the reasonable duration of a stop, it is appropriate to examine whether the police diligently pursued the investigation" (text only)[2] (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985))). In *Leyva*, the question was whether it was permissible for the officer to extend the stop by asking questions *after* the initial traffic stop was complete. 2011-NMSC-009, ¶ 62. The stop in this case was not an extension, but instead was part of a developing situation that required Officer Stacy to determine whether Defendant was legally permitted to operate the vehicle or whether the vehicle needed to be impounded. *See State v. Reynolds*, 1995-NMSC-008, ¶ 22, 119 N.M. 383, 890 P.2d 1315 ("[T]he government has a legitimate interest in making sure that all drivers are licensed."); *see also Sharpe*, 470 U.S. at 686 (noting that a court making a duration determination "should

---

[2]The "text only" parenthetical used herein indicates the omission of any of the following—internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text itself otherwise unchanged.

take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing"). We perceive no Fourth Amendment violation under the circumstances of this case.

**2.      Precedential value of *Affsprung***

{15}      Defendant relied upon *Affsprung*, 2004-NMCA-038, in his motion to suppress, in his briefing before the Court of Appeals, and in his briefing before this Court. In *Affsprung*, an officer asked a passenger of a vehicle for his identifiers and checked for active warrants on him while writing a traffic citation for the driver. 2004-NMCA-038, ¶ 2. The *Affsprung* Court held that the officer's request violated the Fourth Amendment because he had no suspicion of criminal activity to support asking the defendant for his identifiers. *Id.* ¶¶ 19-21. The Court of Appeals reasoned that *Affsprung* was factually distinguishable from the present case and did not rely on it in reaching its decision. *Vasquez-Salas*, A-1-CA-37856, mem. op. ¶¶ 4-5.

{16}      While properly decided under United States Supreme Court jurisprudence at the time, *Affsprung* is in conflict with current United States Supreme Court and New Mexico Supreme Court Fourth Amendment precedent. Prior New Mexico precedent applying the previous Fourth Amendment analysis required that "all questions . . . be reasonably related to the initial reason for the stop or supported by independent and articulable reasonable suspicion." *Leyva*, 2011-NMSC-009, ¶ 2. Five years after

*Affsprung*, the United States Supreme Court decided *Arizona v. Johnson*, 555 U.S. 323 (2009). *Johnson* recognized that "a passenger is seized, just as the driver is, from the moment a car stopped by the police comes to a halt on the side of the road." *Id.* at 332 (text only) (citation omitted). That "temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Id.* at 333. In those instances, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (internal quotation marks and citations omitted).

{17}    As relevant to *Affsprung*, an officer's mission also includes the authority to run background checks on passengers as an "ordinary inquir[y] incident to [the traffic] stop." *Rodriguez*, 575 U.S. at 355 (second alteration in original) (internal quotation marks and citation omitted); *see also id.* at 351-52 (acknowledging a police officer's questioning and records check of a driver and passenger as part of the "justification for the traffic stop"); *United States v. Pack*, 612 F.3d 341, 351 (5th Cir. 2010) (clarifying that it is permissible for an officer to ask a passenger "to

identify himself and to run computer checks on his driver's license and background"), *modified on other grounds by* 622 F.3d 383 (5th Cir. 2010); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (explaining that, in addition to the driver, "an officer may ask for identification from passengers and run background checks on them as well"); *People v. Rodriguez*, 945 P.2d 1351, 1360 (Colo. 1997) ("During a valid traffic stop an officer may . . . run a computer check for outstanding warrants so long as this procedure does not unreasonably extend the duration of the temporary detention."). The objective of these ordinary inquiries is to "ensur[e] that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355.

{18}     Thus, as this Court explained in *Leyva*, in an otherwise-legal traffic stop the proper inquiry under the Fourth Amendment "is whether an officer's traffic stop questions extended the time that a driver was detained, regardless of the questions' content." 2011-NMSC-009, ¶ 17 (internal quotation marks and citation omitted). When the officer asks questions "during the time it [takes] to reasonably complete the initial traffic investigation," the questions are constitutionally permissible. *Id.* ¶ 28. The *Affsprung* Court's holding that the officer's questions about a passenger's identifiers violated the Fourth Amendment because the officer had no reasonable suspicion that the passenger was engaged in criminal activity or no particularized

14

concern about the officer's safety, 2004-NMCA-038, ¶ 19, no longer comports with our analysis in *Leyva*, 2011-NMSC-009, ¶ 17, or the United States Supreme Court's bright-line analysis of the Fourth Amendment in *Johnson*, 555 U.S. at 333, and is hereby overruled. *See also State v. Martinez*, 2017 UT 43, ¶ 18, 424 P.3d 83 (explaining that *Affsprung* is "out of step with the interpretive [Fourth Amendment] framework dictated by United States Supreme Court precedent"). Since *Affsprung* was decided solely under the United States Constitution, we do not opine as to how the facts of that case would fare under the New Mexico Constitution.

{19}     We next consider whether Officer Stacy violated Defendant's rights under Article II, Section 10 of the New Mexico Constitution.

**D.     Article II, Section 10 of the New Mexico Constitution**

{20}     Article II, Section 10 of the New Mexico Constitution establishes that "[t]he people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures . . . ." This Court has consistently recognized that "Article II, Section 10 expresses the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions, and thus identified a broader protection to individual privacy under the New Mexico Constitution than under the Fourth Amendment." *Leyva*, 2011-NMSC-009, ¶ 53 (internal quotation marks and citation omitted). Our New Mexico Constitution requires (1) "a reasonable

15

justification for the initial stop," and, in contrast with the current federal bright-line test under the Fourth Amendment, (2) "that all questions asked during the stop be reasonably related to the reason for the stop or otherwise supported by reasonable suspicion." *Id*. ¶ 55 (outlining the current Article II, Section 10 test); *see also id.* ¶¶ 2-3 (recognizing the current federal bright-line test). The case-by-case approach inherent under the New Mexico Constitution "comports better with the broader protections provided under Article II, Section 10" and "ensures that investigating officers do not engage in 'fishing expeditions' during traffic stops." *Id.* ¶ 55. Over the course of a routine traffic stop, however, reasonable suspicion may arise from the "behavior of both passenger and driver." *Funderburg*, 2008-NMSC-026, ¶ 18.

{21}   Defendant in the present case does not challenge Officer Stacy's justification for the initial stop. Instead, Defendant asserts that Officer Stacy did not have reasonable suspicion to expand the scope of the investigation beyond the initial traffic stop to other criminal activity under Article II, Section 10.

{22}   In support of his assertion, Defendant argues that "an innocent item in a vehicle, without more, does not provide reasonable suspicion to expand the scope" of the stop, citing *Estrada*, 1991-NMCA-026. In *Estrada*, "the only individualized fact known by the agent that could possibly have raised his suspicions was [a] misplaced spare tire." *Id*. ¶ 11. Nothing "indicate[d that] the driver or his passenger

were nervous or displayed unusual behavior of any sort." *Id.* The defendant and his passenger provided proper residency documents, and there were "[n]o other potentially suspicious factor[s] . . . mentioned in the stipulated facts." *Id.* Thus, "[b]ased solely on the misplacement of the spare tire, the agent directed [the] defendant to the secondary area, and [the] defendant and his passenger were asked to exit the vehicle while a dog sniff was performed." *Id.* The *Estrada* Court held that, although a misplaced tire may heighten an officer's suspicion, that factor alone was not so suspicious as to satisfy the reasonable suspicion standard. *Id.* ¶¶ 11-12.

{23}     In contrast with the single factor in *Estrada*, several factors support Officer Stacy's suspicion in this case. These factors include: the time of the stop (*see State v. Ortiz*, 2017-NMCA-006, ¶ 14, 387 P.3d 323 (concluding that an officer had reasonable suspicion to conduct a brief investigatory stop premised on, in relevant part, the time of day)); the backpack in the back seat containing tools, clothing, protective eyeglasses, gloves, and a face mask;[3] the lack of evidence that the tools

---

[3]Defendant, without citing the record, contends that Officer Stacy found the face mask after the traffic stop while searching the backpack. Therefore, according to Defendant, it is after-acquired evidence and should not be considered as a factor in this Court's reasonable suspicion analysis. *See State v. Jason L.*, 2000-NMSC-018, ¶ 20, 129 N.M. 119, 2 P.3d 856 ("The officer cannot rely on facts which arise as a result of the encounter."). We disagree. As an initial matter, we have previously explained that this Court is under no duty to entertain arguments when facts are stated without citing the record. *See Santa Fe Expl. Co. v. Oil Conservation Comm'n*, 1992-NMSC-044, ¶ 11, 114 N.M. 103, 835 P.2d 819. Further, Defendant's recitation

17

were used for a job; the driver's and Defendant's nervous and unusual behavior (*see State v. Van Dang*, 2005-NMSC-033, ¶ 16, 138 N.M. 408, 120 P.3d 830 (holding that the officer's suspicion was reasonable based, in part, on the "[d]efendant's nervousness"); *see also State v. Tuton*, 2020-NMCA-042, ¶ 14, 472 P.3d 1214 (noting that demeanor is considered in weighing the totality of the circumstances)); that the driver was an unlicensed minor; and that both the driver and Defendant provided false identifying information.

{24}    At the suppression hearing, Officer Stacy testified that his training and experience provided a basis for his suspicion that Defendant was engaged in criminal activity. *Compare Van Dang*, 2005-NMSC-033, ¶ 16 (discussing the importance of the officer's training and experience in forming reasonable suspicion of criminal activity), *with Estrada*, 1991-NMCA-026, ¶ 13 (noting that the record was devoid of information regarding the law enforcement agent's experience with the alleged

---

of the facts is inconsistent with Officer Stacy's testimony at the suppression hearing that he saw the face mask through the window as he initially approached the vehicle. The district court judge relied upon this testimony in his ruling from the bench, explaining that "the officer stated that he had seen the backpack . . . in the back of the seat with tools sticking out of it, including bolt cutters, gloves—two sets of gloves—eye-protection, and a *face mask* of some sort." (Emphasis added.) This Court has previously explained that "appellate courts must afford a high degree of deference to the district court's factual findings" and that "[c]ontested facts are reviewed in a manner most favorable to the prevailing party." *Yazzie*, 2019-NMSC-008, ¶¶ 13-14 (internal quotation marks and citation omitted). Therefore, consideration of the face mask is proper.

criminal activity in that case). At trial, Officer Stacy testified that he had on-the-job experience investigating fifty to one hundred burglaries, possibly more. He explained that, in his experience, cutting instruments, seemingly ordinary tools, are used specifically in the commission of a burglary. *See Van Dang*, 2005-NMSC-033, ¶ 16 (quoting *Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979) ("[A] trained, experienced police officer is 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.'")). But Officer Stacy did not rely upon his training and experience in identifying burglary tools as the sole basis supporting his suspicion that Defendant was engaged in criminal activity. Instead, Officer Stacy testified at the suppression hearing that he became suspicious the tools may have been burglary tools only after his interactions with the driver and Defendant because the "driver was real nervous, he was showing [Officer Stacy] all kinds of signs that he was nervous, not wanting to give [him] any kind of identifiers, [and] he seemed to be confused about his age." Defendant also provided Officer Stacy with incorrect information regarding his name, contradictory responses about his age, and evasive responses as to his date of birth. In other words, Officer Stacy's training and experience allowed him to perceive and articulate meaning from the combination of the tools when considered with the driver's and Defendant's conduct, thereby raising his suspicion that Defendant was engaged in criminal activity.

{25} When making a reasonableness determination, we must "necessarily take into account the evolving circumstances with which the officer was faced." *Funderburg*, 2008-NMSC-026, ¶ 16 (text only) (quoting *State v. Duran*, 2005-NMSC-034, ¶ 36, 138 N.M. 414, 120 P.3d 836, *overruled on other grounds by Leyva*, 2011-NMSC-009, ¶¶ 3, 17, 55 (overruling *Duran* on Fourth Amendment grounds while "maintain[ing] the *Duran* standard for reviewing searches and seizures under the New Mexico Constitution")). The officer "may ask follow up questions that will quickly confirm or dispel any suspicion brought on by those answers." *Duran*, 2005-NMSC-034, ¶ 36. "An officer's continued detention of a suspect may be reasonable if the detention represents a graduated response to the evolving circumstances of the situation," *Funderburg*, 2008-NMSC-026, ¶ 16, because "routine questions and requests by a police officer may elicit a strange or suspicious response by a stopped motorist." *Duran*, 2005-NMSC-034, ¶ 36. Follow up questions "must intrude on a person's liberty as little as possible under the circumstances." *Id.* "In weighing the officer's intrusion on [the d]efendant's privacy, we should ask ourselves what other actions a reasonable officer would be expected to take under similar circumstances, if not those taken in this instance." *Funderburg*, 2008-NMSC-026, ¶ 32.

{26} Here, Officer Stacy could have taken other actions to confirm or dispel his suspicions, such as impounding the car because neither the driver nor Defendant was

20

able to legally operate it. However, as in *Funderburg*, none of the available options "would have spared Defendant the risk of an even greater intrusion into his privacy," with the exception of Officer Stacy "simply let[ting] the car go, thereby ignoring his suspicions and turning a blind eye to criminal activity." *Id.* Officer Stacy asking Defendant for his identifiers, the limited questioning being challenged here, was the quickest and least intrusive way to confirm or dispel those suspicions. *See id.* ¶¶ 31-32 (concluding that the officer's actions were constitutionally reasonable when he took the most simple, direct, and minimally intrusive approach by asking a brief question instead of pursuing the alternative options presented).

{27}   As in *Funderburg*, Officer Stacy's actions represented a graduated response to the evolving circumstances of the traffic stop. 2008-NMSC-026, ¶ 28. After it was determined that the driver of the vehicle was an unlicensed minor, Officer Stacy was justified in asking Defendant if he had a driver's license in an attempt to determine whether Defendant could drive the vehicle. Defendant responded that he did not have a driver's license. At this juncture, supported by his experience in investigating numerous burglaries, Officer Stacy's observations of the alleged burglary tools in the back seat, the driver's and Defendant's nervous and unusual behavior thus far, the time of day, the fact that neither the driver nor Defendant had a driver's license, and the driver's confusion about his own age gave Officer Stacy further justification

21

to expand the search and satisfy his suspicion by asking Defendant's age. Defendant's untruthful response to this question provided yet more justification for Officer Stacy to ask Defendant his name and date of birth. *See Leyva*, 2011-NMSC-009, ¶ 61 (explaining that the officer's initial question in that case was justified and that "the response to this question gave [the officer] further justification to expand his search").

{28} Defendant next separates the stop into discreet subparts. First, he describes each tool as common, ordinary, or lawful. Defendant begins with the bolt cutters and proceeds to consider the "protective goggles" and gloves, concluding that all are "lawful to possess . . . absent further information about an unlawful purpose." Finally, Defendant notes that there were no reported burglaries in the area at the time of the traffic stop. We have previously explained that this "'divide-and-conquer analysis'" is an improper method of evaluation for an appellate court to consider when assessing whether reasonable suspicion existed. *See Martinez*, 2018-NMSC-007, ¶ 12 (quoting *Arvizu*, 534 U.S. at 274). Instead, "we must review the totality of the circumstances and must avoid reweighing individual factors in isolation." *Id.* Courts examine the totality of the circumstances because "looking at each act in a series of acts . . . , taken alone, may be susceptible of an innocent explanation." *State*

*v. Hernandez*, 2016-NMCA-008, ¶ 12, 364 P.3d 313. We therefore decline to conduct a divide-and-conquer analysis.

{29} Defendant's remaining arguments (1) analogizing this case to cases decided under a probable cause standard, (2) relying upon cases assessing the sufficiency of the evidence, and (3) contending that law enforcement would be allowed to conduct fishing expeditions if "proximity to a lawful item alone" or "possession of lawful items was enough to support reasonable suspicion," are unpersuasive. We have previously explained that "reasonable suspicion can arise from wholly lawful conduct." *State v. Neal*, 2007-NMSC-043, ¶ 28, 142 N.M. 176, 164 P.3d 57 (internal quotation marks and citation omitted). Further, it is clear that, under the totality of the circumstances, the facts of this case present multiple factors that supported Officer Stacy's reasonable suspicion beyond Defendant merely being in proximity to, or in possession of, lawful items. Finally, for the reasons articulated in this opinion, we believe our reasonable suspicion case law is sufficiently developed that we need not rely upon probable cause or sufficiency of the evidence cases to answer the question before us.

{30} Upon our review of the totality of the circumstances, we conclude that Officer Stacy had reasonable suspicion of criminal activity to support the expansion of the otherwise valid traffic stop under Article II, Section 10.

23

## III. CONCLUSION

{31} Because Defendant's rights were not violated under the Fourth Amendment or Article II, Section 10, we affirm the district court's denial of Defendant's motion to suppress.

{32} **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Justice**

**WE CONCUR:**

_____
**C. SHANNON BACON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**DAVID K. THOMSON, Justice**

24